Good morning, and may it please the Court. Shelby Lemelive, Masters Law Group, representing Susan Chadd, the appellant. I'll endeavor to preserve three minutes of my time for rebuttal. Just keep an eye on the clock. I will. Thank you. Two issues I'd like to discuss with the Court this morning. The first is ONP, or Olympic National Park's failure to move up its nuisance and hazardous animal plan upon either choosing not to haze the animal or realizing that hazing was not working. The second is a more discreet failure starting in June 23rd and 25th, 2009, when they decided to implement a very specific course of hazing this goat on a daily basis, but systematically failed to do so. Neither of these items are discretionary. They are failures to follow through with decisions they made to keep people in the park safe. We can most comfortably rest our decision on an express written policy. Which in particular would you like us to rest our decision on? Well, first the nuisance and hazardous animal plan, which includes a ten-step process by which the park manages animals. So all we can do is measure whether they complied with the ten-step animal plan? No, that is not all you can do. That is the first act, or the first arguably discretionary decision they made. The failure to follow through with hazing or to move up the plan is a non-discretionary decision. But the second in June 2009 is their decision of how they would operate at Level 7 within that plan. Level 7 is referred to as hazing or aversive conditioning. I'm sorry, that was at Step 7? Yes. And what, when did they adopt it? When did they adopt the plan? Yeah. No, what they were going to do about it. In June 2009, and that's specifically the 23rd and 25th. The 23rd, the wildlife ranch chief Patty Happy emails her colleagues indicating a grave concern that someone is going to be injured. This concern is coming to her from park visitors, but she also through her own surmise is warning her colleagues that it may be only a matter of time before the goat injures someone in the park. Now, how do we use that? If it was the boss saying, we've got to do something about this, that's one thing. And if it's somebody that works for the boss saying to the boss, we've got to do something right now, and the boss says no, that's another thing. But it is the boss. What follows that email from Happy is two emails from Kat Hoffman on the same day, and I'll point the court to ER 296, 140, and 192, and 193. That day, Kat Hoffman, who is the natural resource management division at O&P, instructs Happy, Karen Gustin, the superintendent, when Boardman is killed 15 months later, and Ranger Lustig, who at 202 will be put in charge of hazing, to develop a specific plan for hazing this animal on a consistent and daily basis. That is the directive from the top down. So the decision makers are being directed to develop a plan. They decide at ER 140 that the rangers will be in charge of the specific details of that plan, and at ER 202 for implementing that plan. So it does, in fact, come from the top down. What follows that decision on June 25, 2010, is 10 days in which the animal is hazed a At the end of that 10 days, on July 6, Ranger Lustig emails her colleagues and informs them that it is her belief that Ranger Lustig is put in charge of actually carrying out the hazing that O&P is endeavoring to carry out at this point. At ER 141, she emails her colleagues and says it's her belief that further strategizing is required. That's directed specifically to Patty Happy, who, per Kat Hoffman, is put in charge of developing this plan for Ranger Lustig. What she means by further strategizing at SER 88 is to figure out how to do hazing on a consistent basis. She is quite literally at this point saying we need to figure out how we're going to do it often and reliably so that it works. All of this is consistent with the Nuisance and Hazardous Animal Plan, which requires hazing to be carried out concisely and precisely. Isn't your position and your client's position that you just ship and kill? Well, I think it's a practical matter, absolutely, and that is the last level. What does this have to do with it, then? I.e., it seems that your position seems to be that it was just beyond hazing. I think absolutely that's correct, but the... So why is the fact that they didn't follow through on the hazing the non-discretionary act, or the non-discretionary act they should have taken? Because the park can articulate policy reasons for deciding to haze an animal versus deciding to kill it. I understand that, but there seems to be sort of a causation problem. I mean, even if... What you were looking for, I thought, was a non-discretionary obligation to exterminate the animal. No, no. Our argument is that there is a non-discretionary duty to follow through on the course of action they elected to manage this animal, which was to haze it on a consistent and daily basis. Now, if they weren't going to do that, and they, in fact, didn't do that, then yes, absolutely, there is a non-discretionary duty to move up the next levels of the Hazardous Animals Plan, which is ultimately to destroy the animal. There's two failures here. One is to move on upon acknowledging that hazing isn't working, or upon failing to do it. Did the superintendent say to haze the animal daily, or just to increase hazing and patrols? At ER 67, Karen Guston, who is in charge of this operation at that juncture, she is the Her language is to establish a consistent and daily presence on the trail, so that every time the animal is aggressive, it will be met with aversive conditioning by the park. That never happens. At no point do they develop a plan. At no point do they have the further strategizing that Lustig is asking for. In fact, Happy acknowledges at ER 215 that she has no recollection of any further strategizing. At no point do they have a presence on the trail that would allow them to... The boss who exercised her discretion said consistent and daily at trail management, and it wasn't done? It was not done. There is no hazing that occurs after July 6, 2009, in an entire 15-and-a-half month period, until Bob Boardman was killed in October of 2009. There is not one documented incident of hazing. All they are doing is putting a ranger on the trail. Failure to haze from July to October, that's the failure to carry out the discretionary decision to be on the trail daily and haze, what was it, frequently? Consistently and daily. Can you tell me again where in the record this document is that you're talking about? It's an email, right? Where is it? Yeah, the emails are found at 192 and 193, 296, 140, and it's Karen Gustin at 67 that talks about what they meant by an aggressive, intensive, aversive conditioning approach was to be present on the trail to haze the animal on a consistent and daily basis. Not only does that not happen, but there is in fact no hazing over the next 15-and-a-half months. Although the park continues to receive reports of aggressive behavior in 2009, consistent with years dating all the way back to 2006. It had 12 reports in 2006. Why didn't they shoot the thing? I mean, these goats, I guess everybody in the northwest has seen mountain goats and mountain sheep and they really avoid people usually and obviously the reason they don't here is that you can't hunt in the park. How come they didn't shoot it? Our expert would opine that they found it distasteful, but that that was the only proper course of action. Counsel, what about the Galbert case, Supreme Court of the United States that deals with that? I'm not sure precisely what you're asking. As I read Galbert, what it indicates is that there isn't a difference between a policy level decision maker and a person on the ground. But that's not what's the issue here. This is a WISNAT level case that of course distinguishes Galbert on that point. It says that there's a difference between designing the safety regulation and implementing it and that has not to do with the person carrying it out, but the policy level decision being made and that not there. What case law is there that would recognize a decision of the kind you're relying on as sufficient? That is, it's not a regulation. I gather a high level decision that something should have been done. Is there any case law that recognizes that decision as creating a non-discretionary duty? A decision of that kind, which is not embodied in a statute or regulation or order or anything else. There are a number of parks cases and I think I could actually believe it's Terbusch or O'Toole from this court that does deal with these same park management policies and doesn't find in any of them a non-discretionary or, I'm sorry, a mandatory obligation to act, but is dealing with these types of policies as regulations that one could exercise discretionary judgment in exercising, but then again you go back to WISNOT and fail to carry it out not being a discretionary function. So there are cases from the circuit dealing with these same management policies in the national parks in this field. The same thing that happened in 2009 then again happened in 2010, same pattern of action. And I started to say that there were 12 reports in 2006, 17 in 07, 8 in 2008. There are 12 each in 2009 and 2010 as well. So by 2010, in the early part of the season, the parks department is again recognizing goat encounters and aggressive near attack type of behavior as defined by their own plan. They don't haze the animal. Now I'm looking at Guston because it looks like the plan gives Guston the discretion and it looks like you have good evidence that they'd gone to Step 7, what they call aversion training, just making the animal think that people are annoying. And you've got a record that it didn't work. Now is there anything by Guston that says to move on to 8, capture and release elsewhere, 9, capture and relocation elsewhere, or 10, kill the thing? No. Is there anything where she says do it, don't do it, we'll have to move on to that if hazing doesn't work? No. Guston says that her last communication relevant to the course of action undertaken by ONP is that their task is to develop daily and aversive conditioning, and that's in 2009. So what you've got is she instructed, she had the discretion, she instructed daily and aversive conditioning, and that whole summer and fall into the rutting season, it wasn't done after July. That's absolutely correct. And in fact she instructs the rangers in the park to work up the plan. Ten days later they are coming back to her and others at the park and saying we need further strategizing, and at ER 214 through 17 that never happens. And the same thing repeats in 2010. Faced with consistent encounters with a dangerous animal, knowing that they are occurring, they again meet and confer in 2010, they decide to haze the animal, it never happens. At that juncture the only other consideration of further action is to look at the possibility of moving the goat outside of the park, yet at ER 217 Happy acknowledges that she quickly abandons that and doesn't follow through on that process either. At both levels, at the macro level of the plan and the micro level of the decision that they made to operate within it, O&P systematically failed to follow through and failed to keep visitors to the park safe. If there are no other questions I'll reserve the remainder of my time. You may do so, Counsel. Thank you. We'll hear from the United States. May it please the Court. Assistant United States Attorney Teal Luthy Miller on behalf of the United States. This case has been narrowed down to, by plaintiff's brief and her argument here today, the question whether the decision to intensify aversive training was discretionary. I don't think so. I think it's narrowed down a little more than that to whether there should be daily aversive training whether it was done and whether to move on to these next steps, relocation or killing the vicious goat. Where did Guston, she's the boss in whom discretion is lodged, right? Yes. Where does Guston say don't do these things? Guston, there is testimony from several different members of park staff that Guston was presented with the choice of whether or not to kill the goat in June of 2009 or July of 2009 and determined not to. She determined instead to intensify aversive training. That didn't happen. It did happen, Your Honor. Two questions. Sorry, three answers. They asked her to kill the goat in June and July? They suggested that as one of the options. They presented a number of options. No aversive training. Does that mean no, never, just do aversive training or was she saying no, let's try aversive training? She said when you look at the nuisance and hazardous animal management plan, we have a wide range of options. I'm not satisfied and Kat Hoffman. In the depositions? Where are you getting this from? In the depositions. That's right, Your Honor. But I think if you step back and you look at that plan, you'll see there were ten options for them to. Escalating. They were escalating, but they could be undertaken at the same time. And the park made a determination, and it's that determination which was a policy consideration. Okay, but where is the evidence that they did it? That they did it? The evidence is in Ranger Lustig's testimony, her deposition, in which she says, and the district court actually discusses her testimony at page 26 of the ER in the district court's decision. He says. Could you, we have to review De Novo, so whether the district, he can't make findings, so we have to know the record where Lustig says it, not where the district judge says it. Let me answer it in two different ways, actually. Ranger Lustig's deposition makes clear that she was hiking. She worked five days a week. I believe she had Monday and Tuesdays off, and she made an effort every day to go up this trail, and every time she saw the goat, she hazed it if she thought that was the appropriate thing to do. She testified that she hazed it intensively, as opposing counsel said, a couple of times in June of 2009, and it left the area for a month as a result of her having done so. She shot it with a beanbag gun, and it left the area for a month as a result of her action. That was in June? That was in July of 2009. She shot it with a beanbag gun. It left for more than a month, I believe her testimony is. But I think the point is they made a policy. What about that gap that your opposing counsel has talked about between July and October? Well, the gap is, the first part of it is the more than a month period where there were no reports. I don't see it. She hadn't seen it. She was up there almost five days a week. She said she saw the goat about 20 times. I've never seen these things except in Mount McKinley Park where I didn't need binoculars. Usually they're scared of people. Well, that's right, Your Honor. In the national parks, they're kind of trained to think they're the dominant species with respect to people. Well, they're, I think, usually afraid of people. Well, that's right. I also think it is relevant, and the district court concluded that it was relevant, that no goat had ever attacked a person in a national park and never caused a fatality in a national park. And the Park Service, Ranger Lustig says when they were trying to decide in June and July of 2009 how to handle the problem of goats on the rail, they researched. You have some prior attacks by this goat in this park, and the fact that no goat had ever killed anybody just struck me as a matter of chance. I mean, so many tourists in parks are old, and you knock them down, they can break a hip, and that has a 20 percent mortality rate. Your Honor, this was in a wilderness area where this court's cases regarding the national parks, Terbush and Tilders and Valdez and ARA Leisure, recognized that the Park Service has a mandate to preserve conservation and wildness. Wait a minute. What ARA Leisure held, and that's really, I think, the critical case for you, it held that deciding not to put guardrails on the road so that it would lay lightly on the land, in the poetic language of the park management, that was discretionary. But not maintaining the road according to the requirements for road maintenance was nondiscretionary and resulted in liability. And what I'm trying to identify here is, since the discretion was lodged in the boss, and she said, do daily hazing on this trail, daily hiking and hazing when you see the animal, is there or is there not a failure to obey that policy directive from July to October? There is not, because Ranger Lustig was hiking that trail almost every day she was on duty. She reported in her deposition that she saw the goat about 20% of the time that she was up there, and she hazed it when hazing was necessary. She also reported that she shot it with a beanbag gun and it left for more than a month. So from July to October she was hiking the trail almost daily? In 2009 and in 2010. Almost every day she was on duty. She was up there hiking the trail. She was educating people. She was asking them, had they seen the goat? How was the goat behaving when she saw it? I'm not sure. Plaintiffs, I think their characterization of the record is wrong. I also think it goes to negligence. Their argument is at bottom that this was implemented negligently. But even if that were true, and we don't concede that it is, that doesn't mean it was nondiscretionary. The question at this point is, was a policy determination made? I'm not sure of that. What you're talking about now would go to the question of whether a nondiscretionary determination, i.e., because a decision was made to do this, was carried out. And then there would in fact be, it would be nondiscretionary at that point if there was a policy. If all of this happened, would you agree that was a policy that would count? No, I wouldn't. And let me explain why.  It talks about the fact that implementation itself, implementation of a policy decision, is shielded when it implicates policy. And dealing with wild animals, trying to interpret their behavior, trying to balance the value of having wild animals in a wild place versus visitor safety, deciding how to interpret their behavior, deciding what sorts of risks they present, and what sort of risks are acceptable. I don't think you have that case law as it relates to the statute quite right. It looks to me like the statute says the government's liable for negligence like anybody else, but there's an exception when the government is exercising discretion to make policy. So if Guston says, no, I can't stand killing animals, my policy is we don't kill animals in the park, I'm the boss, discretion is lodged in me, and we just flat don't kill animals in the park, and we don't relocate animals in the park. That would be a discretionary decision, and it wouldn't matter if she was putting animal life above human life. There would be immunity for the federal government. However, when there is a decision to haze the animal daily, and if that doesn't work to continue on to removal or killing, and that isn't done, it doesn't have to be gross negligence. It can be ordinary negligence. If it's not a discretionary policy decision, then the FTCA and the cases make the government liable like anyone else. Well, Your Honor, I think if you look at this Court's cases and if you look at the Varig decision, which is a Supreme Court decision about implementation of a safety policy, spot checks on airlines, they make clear that some decisions which might in some sense be characterized as fulfilling a policy decision, if they themselves require the exercise of discretion. Which one are you talking about here? Which decision am I talking about? Yes. I'm talking about the decision, which as I understand it is the only decision at issue at this point, which is the decision to intensify aversive training. That decision was made. That decision was made. Okay. And then what? You're talking about a next level decision. What decision? I don't think there is a next level decision because it's, you can't separate out the decision to intensify aversive training from the, anything that happened in implementing that policy because it was implemented. It sounds like you're having a disagreement about whether it was carried out. It's just a plain old factual disagreement. Well. You're saying it was and they're saying it wasn't. Well, Your Honor, I think it is more accurate. It's not a question about whether it's discretionary. It's whether it happened or not. Well, if that's right and it's discretionary, then we prevail. The district court should be affirmed. That's what I'm trying to find out. Okay. Okay. If the decision was made to do hazer, haze this animal every day you can find him. Yes. And it was. And it was. All right. So do you agree that that was a non, that doing that becomes a nondiscretionary duty as to whomever is assigned to do it? Yes. Ranger Lustig was responsible to haze the goat on a regular basis. All right. So now we just have a factual dispute about whether she didn't or didn't do it, right? Well, the record does show that she did, so. But that's all we, so we don't have to worry about discretionary or nondiscretionary. We just have to find out whether the record demonstrates that she did it or she didn't do it. Well, Your Honor, I think in these discretionary function cases, because discretionary function goes to jurisdiction, the district courts have a little bit more latitude under 12b1 to look at the facts that are relevant to jurisdiction. And that's precisely what the district court did in this case. The district court said I'm going to look at their allegations regarding this decision about intensifying aversive conditioning. I'm going to, the court determined correctly that that decision was a policy-based decision, both that the superintendent had discretion to decide to do that and that it implicated policy. And then how to do that also reflects policy because it's being done in a national park. You're just telling me it didn't. That's what I'm trying to find out. Is there a finding by the district court that she didn't, she did it or she didn't do it? Yes, there is. On page 26 of the excerpts of record, as stated above, they were moving through the plan. Further, Ranger Lustig states that she hiked the Switchback Trail almost every working day and encountered the goat less than about half the time and generally it wasn't doing anything. She states that she would and did aversive conditioning on the goat if it was the right thing to do on a particular day. And as I said, there's also evidence in her deposition that she shot the goat with a bean bag gun in July of 2009 and that caused the boat. She didn't say that she hazed him every day, every time she saw him. Well, she said she didn't see him most of the time she was up there. Doing it in July doesn't carry out the policy. The policy would run through October if they figure, well, it doesn't seem to be a problem anymore and they quit doing it from July to October. Her testimony is that she hiked every day she was on duty from June to October in 2009 and 2010. She was up there all the time. Show me just where that is because since it's summary judgment, the district court cannot make findings of fact. All the district court can do is find that some facts are not genuinely at issue. So show me where she says what you need her to say. Okay. The supplemental exercise of record at page 74. SER 70. And let me go to that, too. She says at 68 and at 68, 73, and 74 of SER are all pages on which she discusses going up to the ridge every day. And let me find. In 2008, it's hard for me to pin down which year she's talking about. She seems to be saying all the time during a period of three years. Okay. Let me direct you to a better place in the record, SER 68. At the bottom of these are four-page sections, and page 18, the last line, I try to make a patrol of the Switchback Trail and up along Kalahani Ridge, part of almost every scheduled workday I work. It doesn't always end up happening. The last two summers in particular, referring to 2009 and 2010, I made an effort to be up there nearly every day I was scheduled to work. And then she says later on, later down that page, they ask when, and she says roughly June through October, which is when there's no snow up on the ridge. Which page are we on now? 68. Okay. Of the supplemental excerpts. Okay. She says on page 73. Where's the summer 2010 on this page? It's on the small page 20 of SER 68. Okay. And she says, I think it's also clear, and I want to push back a little bit on the – She says she's keeping an eye on the goat. Where does she say she's doing the hazing of him? She says on – It says, so you were going up there in 2010, 2011 years to keep an eye on the goat? Yes, in 2009 as well. So it doesn't look like anyone asked you about the period specifically from July to October of the year of the killing. Well, I direct the Court's attention to page 96 of the supplemental excerpts. I actually think there's a long period. I'm sorry I'm giving you the scatter shot. There's actually a long part of this deposition in which she makes clear how intensely she was up on that ridge. But that's not the question, how intensely she was up on the ridge. Well, Your Honor, if the decision we're talking about here now is to intensify aversive conditioning. I thought it was to do it every day. To do it every day. I think there actually is still discretion, and I'm going to push back a little bit on where you've ended up, because there's deposition testimony from the chief naturalist and the chief wildlife biologist that in June of 2010, they said we didn't feel we had fully tried aversive conditioning. So they felt there was still room to implement the superintendent. And did they then do it? In 2010, they started to do it, and they didn't find the goat up there. The picture plaintiffs have drawn is that there was a threatening goat there every time someone went up there. In fact, wildlife management requires discretion because it's much less straightforward than that. Sometimes the goat was there, sometimes it was not. Most of the reports of encounters with the goat were denied. When it was there, Ranger Lustig testified that she hazed it when it was appropriate. And we know that she took a shotgun up in 2010 to look for it and didn't find it. Counsel, before your time is up, but I need to ask you, the WisNant case, you heard counsel support WisNant. What's your response? My response is footnote 3 of WisNant and Bailey's discussion, a footnote 3 of WisNant, which make clear that implementing a safety policy is still discretionary when there are policy considerations on the other side. And here in this case, there are policy considerations on the other side. Well, certainly at a mega level, that's true. The question is whether this has gotten to a non-mega level. Well, I think there's always an effort by a plaintiff in this kind of a case to try and focus on the narrowest decision possible to remove discretion. But there are also a number of cases from this circuit recognizing under the Organic Act. What this case comes down to is whether either there was discretion left in Agent Lustig to either because from what you said, she didn't say I did it whenever I saw the goat. She said I did it when I thought it was right. So the question was did she have the discretion to do that or was the policy to just do it every time you saw the goat? And then did she do it? Well, Your Honor, she did have discretion left to make a determination about appropriate hazing because Superintendent Gustin's order was let's intensify hazing. It wasn't and do it in precisely this manner at precisely this time of day using precisely these techniques. It recognized that it's discretionary, that people dealing with wildlife have to make an assessment of what's going on with them that day. And all of the depositions make very clear that they The comparison you made is invalid. When you talked about where the implementation is shielded, where the implementation implicates policy concerns, what the Wisenhand case actually says in footnote three is that that applies to context such as where the government officials must consider competing firefighter safety and public safety considerations in deciding how to fight a forest fire. Well, that's right, Your Honor. Prison safety and inmate privacy in deciding how to search a prisoner's cell in response to a reported threat of violence. That's right. There was no such balancing here. It wasn't, well, on the one hand, patrolling the trail every day would save visitors from injury or death. On the other hand, it's too dangerous for the park service employees to do it. So we're not going to do it. That would be analogous. Your Honor, there was a policy balance here. There was preserving wildlife. As the court suggested, it was within the superintendent's discretion to remove this goat. But I can't see where she ever said, no, we're never going to kill this goat no matter how much of a threat it is. All she said was we're going to move up. She said not yet, which means we're going to move up or down the ten steps, and hopefully something will work before we have to kill the goat. And I'm trying to figure out whether step seven was carried out. Step seven was in the process of being carried out. It wasn't done. And the record is very clear. What it looks more like is that step seven was carried out intermittently, not at the critical time, and the employees carrying it out told her it failed. There is no allegation here that the park service saw this goat when they went, that Ranger Listube went up and saw this goat and ignored it. Her testimony is very clear that she was looking for it on a daily basis, that she was educating people, and that when it was doing something, that made it appropriate for her to condition it. Is this nearer as to July to October as opposed to her saying, I was up there a lot over a three-year period? Your Honor, I think I do, and I'd be happy to submit a letter to the court summarizing this testimony more effectively, because I can tell that I haven't satisfied you. But it is here. It is here, both that Ranger Listube was up there every day trying to aversively condition this goat, and also that the decision-makers felt that aversive conditioning still had more room to work with this goat. All right, counsel, go ahead and provide us with the record citation to that passage in direct response to Judge Kleinfeld's question. Certainly, Your Honor. Please. Your time has expired. Thank you. We'll hear from the other side. You have some reserved time. It would be helpful to me, since we seem to have gotten down to a very fine point at this point, for you to tell me exactly what the critical e-mail said in terms of the policy that you're claiming exists. Well, what the e-mails say from Kat Hoffman are to develop a plan for what she refers to are aggressive, intensive, aversive conditioning. It didn't say do it every time. It didn't say. No, her e-mails don't. She tells her subordinates at the park to work up the specifics and the plan for how to carry out aggressive. All right. Is there, then, a plan? There is not. And I think what you're referring to comes at ER 67. That's actually Guston, after the fact, saying what we meant by intensive or aggressive aversive conditioning is to establish a daily and consistent presence on the trail so that whenever the animal is aggressive, we can be there. She says be there literally every time behavior. Then what is the evidence that that didn't happen? First of all, it sounds like there's not even very good evidence that there ever was a plan. There wasn't a plan. Then why isn't that collapsing to the discretionary decision? Because there wasn't a discretionary decision not to make a plan. They simply failed to do it. So now we're up to not carrying out a plan, but carrying out a plan to make a plan. Yes. That is quite literally the failure, and I'll again point to the nuisance and hazardous animal plan that requires that hazing be done under an approved plan. They're told to do it in writing. They're told to do it by their superior. They never develop a plan. They acknowledge 10 days later that they need further strategizing on developing a plan. Not only do they not have a plan, they never establish the consistent and daily presence on the trail that is necessary to make hazing effective. Is there something clear in the record that shows that they didn't? Your adversary is pointing to things in the record that says they did. Well, what she's pointing to is Lustig's testimony, that she hiked the trail a maximum of four to five days a week. Now, that is not consistent in daily presence. Kind of close. Well, it's four or five days a week. The animal's out there seven days a week hazing park visitors. She acknowledges at SER 96 that she doesn't recall any instance of hazing the goat in 2010. She says the animal wasn't even seen a good portion of the time. Well, that's actually not true. She acknowledges seeing it repeatedly and electing not to haze it. That is not a discretionary function exception decision. That is an exercise of scientific or professional judgment that the animal is not behaving in a way that warrants hazing. That's not a policy-based decision. That's a scientific biology decision not to haze an aggressive animal. It is also inconsistent with the behavior that park visitors are seeing repeatedly throughout the season. They knew the animal was dangerous. Their own staff is reporting to them incidences of being backed up against a tree for half an hour, waving an ice axe. Their own staff is saying it's a matter of time before someone is hurt. Their own staff is saying we don't think hazing is going to work. And instead of developing a plan or putting people on the trail daily, they don't haze the animal for 15-and-a-half months until it killed Bob Boardman in October. That is not a discretionary decision. That is a failure to follow through. Is there anything in the record? I'm curious about that. The moose that come around our house, they sort of have a schedule. Sometimes a day you don't see them, sometimes you do. And I'm curious, did this goat have a schedule? Like it bothered people in the morning but not in the afternoon? Animals often do. Was there something in the record about this one? So I'm not going to be able to cite to the record for that, and I apologize, but I think if I direct you to the declarations of Valerius Geist and Rich Olson, they probably indicate that it's more likely to be on the trail in the morning than in the evening. In the morning. That sounds right to me. So if you had actually directed your efforts to that place. Was Hoppy hiking in the morning? We don't know when. It was Lustig that was out on the trail, and we don't know when she was hiking the trail. It's a morning goat, and we don't know when Lustig. We don't know when she's there. And frankly, whether she's there or not, you know, that really goes to how poorly they implemented the plan, not whether they did it, but exactly to what degree, how poor exactly was their implementation. Because it's clear that there's no plan, and it's clear they haven't established a consistent and daily presence. And that is what they said that they would do. Thank you, Counsel. Your time has expired. The case just argued will be submitted for decision.
judges: O'scannlain, Kleinfeld, Berzon